UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **IN THE MATTER OF THE SEIZURE OF:**<br><br>**ANY AND ALL FUNDS ON DEPOSIT IN BANK OF AMERICA ACCOUNT #XXXXXXXX2969 HELD IN THE NAME OF "JAMES PADDINGTON, LLC"**<br><br>**ANY AND ALL FUNDS ON DEPOSIT IN BANK OF AMERICA ACCOUNT #XXXXXXXX4287 HELD IN THE NAME OF "JOHN GLASGOW SOLE PROPRIETORSHIP DBA JOHN GLASGOW"**<br><br>**ANY AND ALL FUNDS ON DEPOSIT IN BANK OF AMERICA ACCOUNT #2XXXXXXXX9254 HELD IN THE NAME OF "JAKE STEEL, LLC"** | Mag. No. _____ |

I, Special Agent Julie Hilario, being duly sworn, depose and state as follows:

## I.     ITEMS TO BE SEIZED

This affidavit is submitted in support of an application for seizure warrants for the following bank accounts all held at the Bank of America branch located at 722 H Street, NE, Washington, DC:

1. **Any and all funds on deposit in Bank of America account #XXXXXXXX2969 held in the name of "James Paddington, LLC" ("Account A")**

2. **Any and all funds on deposit in Bank of America account #XXXXXXXX4287 held in the name of "John Glasgow Sole Proprietorship dba John Glasgow" ("Account B")**

3. **Any and all funds on deposit in Bank of America account #2XXXXXXXX9254 held in the name of "Jake Steel, LLC" ("Account C")**

1

## II.     AFFIANT'S EXPERIENCE

1. I am a Special Agent with the United States Department of Homeland Security ("DHS"), U.S. Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and have been so employed since December 2006. I am currently assigned to the Cyber Crimes Group, Special Agent in Charge, Washington D.C. Field Office. My duties as a Special Agent with HSI include, but are not limited to, the investigation of federal laws governing the importation of counterfeit goods into the United States and trafficking in such counterfeit goods. I have received training in general law enforcement, including training in Title 18, United States Code, and I am a graduate of the Federal Law Enforcement Training Center at Glynco, Georgia. I have personally investigated numerous cases involving counterfeit goods. I worked at U.S. Customs and Border Protection ("CBP") as a customs technician from 2000 to 2002, and as a seized property specialist from 2002 to 2006, before I became a Special Agent in 2006.

2. This Affidavit is being submitted for the limited purpose of establishing probable cause to obtain seizure warrants. Thus, it does not contain every fact known by me or the United States. Where conversations or statements are related herein, they are related in substance and in part, except where otherwise indicated. Unless otherwise stated, the information in this affidavit is either personally known to me or has been provided to me by other law enforcement officers and/or is based on a review of various documents and records.

## III.     PURPOSE OF APPLICATION AND LEGAL DISCUSSION

3. In 2012, law enforcement personnel with HSI and CBP were investigating individuals and businesses in Washington, DC, that were suspected to be trafficking in and distributing counterfeit products, including counterfeit digital video discs ("DVDs"), compact discs ("CDs"), and other products. As discussed in detail in the Probable Cause section below, there is probable cause to believe that John

Glasgow ("Glasgow") had committed violations of 18 U.S.C. § 541 (Entry of Goods Falsely Classified); 18 U.S.C. § 542 (Entry of Goods by Means of False Statements); 18 U.S.C. § 545 (Smuggling Goods into the United States); 18 U.S.C. § 1956 (Money Laundering); 18 U.S.C. § 2319 (Criminal Infringement of a Copyright); and 18 U.S.C. § 2320 (Trafficking in Counterfeit Goods or Services). As set forth below, acts or omissions constituting, and acts or omissions in furtherance of, the offenses under investigation occurred within Washington, D.C. *See* 18 U.S.C. § 3237.

4. This Affidavit is submitted in support of seizure of the above-listed property by civil and criminal seizure warrants. I apply for warrants under both the civil and criminal provisions because the above-listed property could easily be removed from the reach of the Court and to ensure the availability of the items for forfeiture in the event of a conviction. There is probable cause to believe that the above-listed property is subject to civil seizure and forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) as any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of any offense constituting a specified unlawful activity or a conspiracy to commit such an offense. Violations of 18 U.S.C. §§ 541, 542, 545, 2319, and 2320 are specified unlawful activities under 18 U.S.C. § 1956(c)(7). The above-listed property is also subject to civil seizure and forfeiture pursuant to 18 U.S.C. §§ 981 and 2323(a)(1)(C) as any property constituting or derived from any proceeds obtained directly or indirectly as a result of a violation of 18 U.S.C. §§ 2319 and 2320.

5. There is probable cause to believe that the above-listed property is subject to criminal seizure and forfeiture, pursuant to 18 U.S.C. § 982(a)(2)(B), as any property, constituting or derived from, proceeds obtained directly or indirectly, as the result of a violation of 18 U.S.C. §§ 542 and 545. There is also probable cause to believe the above-listed property is subject to criminal seizure and forfeiture, pursuant to 18 U.S.C. § 2323(b)(1), as any property constituting or derived from any proceeds obtained directly or indirectly as a result of a violation of 18 U.S.C. §§ 2319 and 2320. Additionally, there is probable cause

3

to believe that the above-listed property is subject to criminal seizure and forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and (b), 21 U.S.C. § 853(f), and 28 U.S.C. § 2461(c).  Section 2461(c) permits the United States to seek the criminal forfeiture of property for any offense for which civil forfeiture is authorized.  As discussed in the previous paragraph, there is probable cause to believe that the above-listed property is subject to civil forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. §§ 541, 542, and 545.

6. The domestic promotional money laundering statute, 18 U.S.C. § 1956(a)(1)(A)(i), prohibits conducting (or attempting to conduct) financial transactions involving the "proceeds of some form of unlawful activity . . . with the intent to promote the carrying on of specified unlawful activity."  As noted above, violations of 18 U.S.C. §§ 541, 542, 545, 2319, and 2320 are specified unlawful activities.

7. Pursuant to 18 U.S.C. § 981(a)(1)(A), any property, real or personal, which is involved in a transaction (or an attempted transaction) in violation of 18 U.S.C. § 1956, or any property which is traceable to such property, is subject to civil forfeiture.  Pursuant to 18 U.S.C. § 982(a)(1), any property, real or personal, which is involved in a violation of 18 U.S.C. § 1956, or any property which is traceable to such property, is subject to criminal forfeiture.

8. Under these statutes, money laundering forfeiture applies to more than just the proceeds of the crime.  Rather, money laundering forfeiture encompasses all property "involved in" the crime, which can include untainted or legitimate funds that are comingled with tainted funds derived from illicit sources.

9. The issuance of civil seizure warrants is authorized by 18 U.S.C. §§ 981(b)(2) and 2323(a)(2) (which incorporates by reference the provision of 18 U.S.C. § 981).  The issuance of criminal

seizure warrants is authorized by 18 U.S.C. §§ 982(b)(1) and 2323(b)(2)(A) (both provisions incorporate by reference 21 U.S.C. § 853, which authorizes the issuance of seizure warrants).

## IV.      PROBABLE CAUSE

### Shipments of Counterfeit DVDs to Glasgow's Address Prior to Feb. 7, 2012

10.     Glasgow resided at XXXX XXXXXXXXXXXXXXX, Washington, DC, 20003. According to CBP records, this address had been associated with approximately 400 international shipments between February 2007 and February 2012. This included approximately 16 prior seizures made by CBP of counterfeit goods between October 14, 2009, and January 11, 2012. The 16 prior seizures contained a total of approximately 522 sets of various counterfeit DVD Series sets which, if legitimate, would have been valued at approximately $161,000 based upon the Manufacturer's Suggested Retail Price ("MSRP"), and 568 counterfeit Canon and Sony camera batteries valued at approximately $35,000 based upon the MSRP. The hundreds of international shipments to Glasgow's address, including the 16 prior seizures, listed various names as the intended recipient, including John Glasgow, Jon Glasgo, Jack Glasgow, Jack Glass, Capa Icarus, and Capa Icavus.

11.     For each of the 16 prior seizures, CBP had issued an official notice to Glasgow explaining that the shipment has been seized due to the fact that importation of counterfeit goods is a violation of 18 U.S.C. § 2320. The official notices were sent by certified mail with return receipt requested when the amount of the shipment exceeded $5,000 and by regular U.S. mail otherwise. The notices were always sent to the address on the intercepted shipment, which was Glasgow's address. In each instance that CBP sent a return-receipt requested, it received the return-receipt indicating that the official notice was delivered to Glasgow's address. No notices were returned to CBP. Each official notice explained that Glasgow has the right to contest the seizure or can choose not to contest the CBP findings that the shipment is subject to seizure.

12.     On two separate occasions, September 28, 2011, and October 7, 2011, Glasgow sent a response to CBP's official notice from his home address.  Glasgow did not contest CBP's findings.  He stated that he had purchased the DVDs on eBay and submitted a form indicating that he was abandoning any interest he may have had in the items.

**Shipments of Counterfeit DVDs Intercepted by CBP on or about Feb. 7, 2012**

13.     On or about February 7, 2012, CBP officers conducted inspections of international express consignment shipments at the Washington, DC, DHL facility.  CBP examined the contents of six shipments that had arrived from Hong Kong addressed to "J GLASGOW, XXXX XXXXXXXXXXXXXXXXXX, Washington, DC, 20003."

14.     The first shipment bearing DHL Air Way Bill number 2104610292, contained in one box, was manifested by the shipper JINHUI TRADE GROUP LTD, Hong Kong, as "Equipment & Materials of Fitness" with the quantity listed as 13 each and a declared value of $169.  Examination of this box revealed approximately 15 sets of counterfeit DVDs of "The Sopranos Complete Series" which, if legitimate, would have been valued at an approximate total MSRP of $5,250.

15.     The second shipment bearing DHL Air Way Bill number 2104618854, contained in one box, was manifested by the shipper TOU ZI TRADE GROUP LTD, Hong Kong, as "Learning Manuals" with the quantity listed as 100 each and a declared value of $84.  Examination of this box revealed approximately 30 sets of counterfeit DVDs of "The Big Bang Theory Complete Series" which, if legitimate, would have been valued at an approximate total MSRP of $6,000.

16.     The third shipment bearing DHL Air Way Bill number 2104618935, contained in one box, was manifested by the shipper TOU ZI TRADE GROUP LTD, Hong Kong, as "Learning Manuals" with the quantity listed as 50 each and a declared value of $80.  Examination of this box revealed

approximately 30 sets of counterfeit DVDs of "The Big Bang Theory Complete Series" which, if legitimate, would have been valued at an approximate total MSRP of $6,000.

17. The fourth shipment bearing DHL Air Way Bill number 2104594004, contained in one box, was manifested by the shipper JINHUI TRADE GROUP LTD, Hong Kong, as "Training Materials" with the quantity listed as 20 each and a declared value of $62. Examination of this box revealed approximately 30 sets of counterfeit DVDs of "The Big Bang Theory Complete Series" which, if legitimate, would have been valued at an approximate total MSRP of $6,000.

18. The fifth shipment bearing DHL Air Way Bill number 8958631566, contained in two boxes, was manifested by the shipper WU RONG, Hong Kong, as "Teaching Materials" with the quantity listed as 100 each and a declared value of $80. Examination of these boxes revealed approximately 22 sets of counterfeit DVDs of "The Twilight Zone Complete Series" which, if legitimate, would have been valued at an approximate total MSRP of $5,500.

19. The sixth shipment bearing DHL Air Way Bill number 9434638231, contained in two boxes, was manifested by the shipper ZHENG XIAO YAN, Hong Kong, as "Teaching Materials" with the quantity listed as 40 each and a declared value of $120. Examination of these boxes revealed approximately 14 sets of counterfeit DVDs of "The West Wing Complete Series" which, if legitimate, would have been valued at an approximate total MSRP of $2,800.

20. The above six shipments, totaling approximately 141 sets of various counterfeit DVD series sets which, if legitimate, would have been valued at approximately $31,550 MSRP, were seized by CBP on February 7, 2012, pursuant to 18 U.S.C. § 2320. CBP determined that the various DVDs were counterfeit because, among other things: (a) the shipping manifests misstated the actual contents of the packages; (b) certain DVDs, such as "The Sopranos," are produced by companies like HBO who do not manufacture their legitimate products in the country from

which the DVDs were shipped; and (c) none of the DVDs contained any package sealing/security features that appear in legitimate copies of the products.

### Controlled Delivery and Execution of Search Warrant at Glasgow's Residence

21. On February 8, 2012, the six shipments were transferred to the custody of HSI. On February 10, 2012, HSI conducted a controlled delivery of these six shipments to Glasgow's residence. Glasgow accepted the entire shipment.

22. On February 10, 2012, HSI agents executed a District of Columbia Superior Court search warrant at Glasgow's residence. The execution of the search warrant occurred approximately 15 minutes after the controlled delivery. Glasgow was present during the execution of the search warrant, and the six shipments delivered by HSI were still at his residence.

23. At the request of HSI, B.H. was present during the search of the residence. B.H. was a field investigator for the Motion Picture Association of America. B.H. specialized in intellectual property crimes, including the detection and recognition of infringed and pirated goods. B.H. has been qualified as an expert witness in state and federal courts.

24. HSI seized approximately 1,965 DVDs from the residence. B.H. examined approximately 300 of the 1,965 DVDs. B.H. concluded that the 300 DVDs were counterfeit. HSI seized approximately 1,334 camera batteries. As discussed below, Glasgow admitted that the batteries were counterfeit.

25. HSI agents observed other items at the residence, including video game controllers, universal remote controls, and video games. These items appeared to be intended for resale. HSI agents did not suspect that these items were counterfeit and did not seize them.

26. HSI agents interviewed Glasgow. Glasgow admitted that he is in the business of purchasing counterfeit goods and some legitimate goods and then reselling them on Amazon and Half.com.

8

He stated that he began the business in 2006, but stopped after approximately one and one-half years. He then started again in 2009 and had been continuously selling goods since that time.

27. As explained in greater detail below, Glasgow initially denied knowingly purchasing and reselling counterfeit goods. He also made statements that initially minimized the full nature and extent of his counterfeit business activity.

28. HSI agents questioned Glasgow about the six shipments in the controlled delivery. Glasgow said that he ordered the merchandise in those shipments from Dhgate.com. HSI agents informed Glasgow that the items were counterfeit. Glasgow claimed to be surprised. HSI agents asked Glasgow if any of his shipments had ever been seized. Glasgow initially stated that one or two shipments had been seized. He then said 10 shipments had been seized. HSI agents told Glasgow that 16 shipments had been seized. Glasgow described Dhgate.com as a host site that different companies use to sell goods. Glasgow said that most of the shipments he received from Dhgate.com were shipped from China and Hong Kong, but that some were from California. Glasgow stated that he sometimes used an alias to purchase goods from Dhgate.com. Glasgow admitted that he knew that all of the items shipped to him from China and Hong Kong were counterfeit. CBP records indicate that Glasgow received approximately 169 shipments from Hong Kong and China between February 15, 2007, and February 2012. Glasgow stated that he purchased all of the batteries at his residence from Dhgate.com. He admitted that all of the batteries at his residence were counterfeit.

29. Glasgow stated that he purchased the DVDs at his residence from Dhgate.com, Amazon, eBay, Warner Brothers, and two wholesalers in Tennessee. He used PayPal to pay the two wholesalers in Tennessee. Glasgow acknowledged that the DVDs purchased from Dhgate.com were counterfeit. He maintained that the DVDs purchased from the other sellers were legitimate. HSI agents questioned Glasgow about the prices that he paid for the DVDs from the other sellers. Glasgow then conceded that

these DVDs were likely counterfeit due to their low sale price.

30. Glasgow initially said that he sold counterfeit items on Half.com and initially claimed to sell only legitimate items on Amazon because of Amazon's strict anti-counterfeiting measures. As discussed in more detail below, Glasgow later admitted that he did sell counterfeit items on Amazon. Glasgow explained that he has a merchant account in his own name at Half.com, and accounts in the names of four businesses on Amazon. The four business accounts are in the names of "Jake Steel," "Steve Borders," "James Paddington," and "Quality Quick."

31. HSI agents seized documents relating to business entities from Glasgow's residence. These documents are the sources of the information described in the next paragraph.

32. On or about August 23, 2010, Glasgow registered "Jake Steel, LLC," with the District of Columbia Department of Consumer and Regulatory Affairs ("DCRA") using his home address. On or about June 9, 2011, Glasgow registered Steve Borders, LLC, with the DCRA. On the registration application, he listed himself as the owner and manager with his home address as the principal place of business. The company's purpose was described as "sell DVDs, other media, and electronics online." On or about June 22, 2010, Glasgow registered James Paddington, LLC, with the DCRA. A 2010 IRS tax return for "James Paddington, LLC," listed its principal business as "online retail," and its principal products as "DVD/media." On or about October 19, 2010, Glasgow registered "Trois Amis, LLC," with the DCRA. District of Columbia records characterize the business as "shipping entertainment." On an "Indiana Business Tax Closure Request," dated January 20, 2012, for "Trois Amis, LLC," Glasgow is listed as the owner and manager, and his residence is listed as the business address. On or about April 12, 2010, Glasgow registered "Henry Van Wagengerg, LLC," with the DCRA using his home address.

33. HSI agents questioned Glasgow about why he had multiple Amazon merchant accounts. He initially said that he used the multiple accounts so that he could maximize his purchases in cases where

he was buying items for resale and the seller limited the amount of items that an individual buyer could purchase. Glasgow later stated that he did sell counterfeit goods on Amazon. He said that he used multiple business merchant accounts so that if Amazon closed an account because of the sale of counterfeit goods, he could continue to sell counterfeit goods under another business account. Glasgow explained that one can open an Amazon business merchant account without providing the name of an individual associated with that business. Glasgow stated that Amazon had closed his "Steve Borders" merchant account because of the sale of counterfeit batteries, and that he had then opened a business merchant account in the name of "James Paddington."

34. Glasgow explained that he ships goods to Amazon for resale to buyers. Amazon sends the item to the buyer upon purchase and deposits the sale proceeds into one of his merchant accounts. Approximately every two weeks, Amazon transfers the sales proceeds minus a 15% commission to a bank account established by Glasgow that is linked to the particular merchant account.

35. Glasgow said that Half.com also transfers sale proceeds from Glasgow's merchant account to a bank account linked to the merchant account.

36. Glasgow stated that he has a mail box at a UPS store in Washington, DC. He acknowledged that he had some counterfeit goods shipped to that location.

37. HSI agents questioned Glasgow about importation requirements for international shipments, including information on the manifest. He initially claimed that he had no knowledge about the requirements. Glasgow later admitted that information contained on the manifests for international shipments to his residence contained false descriptions of the items in the shipment and false values. Glasgow did not specify whether he was referring only to manifests for international shipments from Hong Kong and China, or also from additional countries.

11

## V.     TRACING PROCEEDS TO ACCOUNTS TO BE SEIZED

38.    As described in detail above, approximately 400 international shipments were sent to Glasgow between February 2007 and February 2012. CBP records indicate that approximately 169 of the international shipments originated in Hong Kong or China. Glasgow has admitted that all of shipments from China and Hong Kong contained counterfeit goods. CBP seized 16 of the international shipments and sent notices to Glasgow that the shipments had been seized because they contained counterfeit goods. The aggregate value of those shipments was approximately $200,000 MSRP. Glasgow never contested the 16 seizures. HSI agents seized approximately 1,965 DVDs from Glasgow's residence. An expert in the recognition of counterfeit DVDs examined approximately 300 of the DVDs and concluded that they were counterfeit. Glasgow conceded that the DVDs he purchased from within the United States for resale were likely counterfeit. HSI agents seized approximately 1,334 camera batteries from Glasgow's residence, and Glasgow admitted that they were all counterfeit. Glasgow used aliases to purchase items for resale. He stated that Amazon closed one of his merchant accounts because he was selling counterfeit goods. Glasgow admitted that he opened multiple Amazon merchant accounts so that he could continue to sell counterfeit goods if Amazon closed one of his accounts.

39.    HSI agents questioned Glasgow about how much money he earned from selling goods. He stated that he earned approximately $20,000 to $30,000 per year in both 2009 and 2010, and $100,000 in 2011. Glasgow did not specify if these figures referred to his gross sales or net profit. Glasgow claimed that he reported a loss on his income tax returns in 2009 and 2010. Glasgow stated that his current monthly gross sales in February, 2012, were approximately $200,000.

40.    HSI agents seized a number of financial institution account records from Glasgow's residence, including records for the above-listed accounts. The seized records identify the account numbers and names on the above-listed accounts. HSI agents also asked Glasgow to identify accounts

that contained proceeds from his business. Glasgow provided a number of such accounts including, but not limited to, some of the accounts discussed below. Glasgow did not have any records in front of him when he provided this information. He stated that he had no other source of income other than sales from his business, and that all of his business accounts contained only funds from the sales of merchandise. Glasgow also identified accounts that did not contain proceeds from his business, such as a trust fund account from a relative. These accounts are not named for seizure in this affidavit.

41. Glasgow appeared to be living a modest lifestyle, that is, his rent was low for a Capitol Hill address; his residence was not furnished with high-value items; and he was driving an inexpensive vehicle. It did not appear that he was using the proceeds of his sales to purchase items for himself. HSI subsequently obtained bank statements for Accounts A, B, and C. Those statements showed payments made to PayPal and large payments made to credit card companies. Glasgow had stated that he had paid his Tennessee suppliers using PayPal. Additionally, as it did not appear that Glasgow possessed property consistent with large credit card bills and there is no other evidence of Glasgow paying his other suppliers, there is probable cause to believe that these credit card payments reflect Glasgow's payments to those suppliers.

### Business Accounts Identified by Glasgow

### Bank of America

42. Glasgow stated that he had one Bank of America checking account in the name of "James Paddington, LLC;" one Bank of America checking account in the name of "Jake Steel;" and one Bank of America checking account in the name of "John Glasgow," as a sole proprietorship, that contained proceeds from his business. Account A is a Bank of America checking account in the name of "James

Paddington, LLC;" Account B is a Bank America checking account in the name of "John Glasgow Sole Prop dba John Glasgow;" and Account C is a Bank of America checking account in the name of "Jake Steel, LLC."

**Updated Information**

43.     HSI previously obtained and executed seizure warrants on February 13, 2012, for all funds in Account A (1:12-mj-00117 (Under Seal)), Account B (1:12-mj-00118 (Under Seal)), and Account C (1:12-mj-00119 (Under Seal)), resulting in the seizure of $25,776.96 from Account A, $14,491.59 from Account B and $44,050.07 from Account C (for an unexplained reason, $400.50 remained in the account after the service of the seizure warrant and from which the bank deducted $5.64 as an interest payment on uncollected balances).  Bank of America has informed HSI of additional funds deposited into these accounts subsequent to the service of the original seizure warrants.  Account A subsequently received deposits from Amazon.com on February 21, 2012, and March 5, 2012, resulting in a remaining balance in the account of $17,950.35.  Account B subsequently received a deposit from Half.com on February 24, 2012, resulting in a remaining balance in the account of $2,619.22.  Account C subsequently received deposits from Amazon.com on February 16, 2012, and March 1, 2012, resulting in a remaining balance in the account of $32,159.31.  Each of these accounts has remained "frozen" since February, 2012, that is, the only activity to have occurred in these accounts is the activity described above.

44.     Analysis of the items seized from Glasgow, both in intercepted shipments and the items seized from his home, indicate that at least 80% of Glasgow's business proceeds derived from counterfeit goods and 20% from legitimate goods.  The proceeds of these sales were commingled in Glasgow's accounts and then, as noted above, used to promote the purchase and sale of additional counterfeit and legitimate goods.  Accordingly, the current proceeds are property traceable to violations of 18 U.S.C. § 1956 and therefore the entire balance in each

account is subject to forfeiture.

## CONCLUSION

45.	Based upon the foregoing, there is probable cause to believe that John Glasgow has committed violations of 18 U.S.C. § 541 (Entry of Goods Falsely Classified); 18 U.S.C. § 542 (Entry of Goods by Means of False Statements); 18 U.S.C. § 545 (Smuggling Goods into the United States); 18 U.S.C. § 1956 (Money Laundering); 18 U.S.C. § 2319 (Criminal Infringement of a Copyright); and 18 U.S.C. § 2320 (Trafficking in Counterfeit Goods or Services), and that he has deposited proceeds of those offenses into the above-listed accounts. Thus, the above-listed funds are subject to seizure and forfeiture pursuant to the statutes set forth above.

The statements above are true and accurate to the best of my knowledge and belief.

_____
Julie Hilario
Special Agent
Department of Homeland Security
U.S. Immigration and Customs Enforcement
Homeland Security Investigations

Subscribed to and sworn before me on this __6th__ day of December, 2016.

_____
G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE